**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


SMS DEMAG, Inc., a Pennsylvania Corporation,   )
               Plaintiff,   )
                     )
     v.   )      Civil Case No.  05-00466
                     )      Judge Nora Barry Fischer
ABB TRANSMISSONE & DISTRIBUZONE,   )
S.p.A., a Foreign Corporation,   )
               Defendant.   )


## MEMORANDUM OPINION

## I.    INTRODUCTION

The instant case involves the application of two similar but not identical contracts and the

legal effect, if any, of an arbitration (and confirmation of the same in another federal district court)

on the instant lawsuit stemming from the failure of a Electric Arc Furnace transformer in Kentucky.

Pending before the Court for consideration is Plaintiff's Motion for Partial Summary

Judgment [19] and Defendant's Motion for Partial Summary Judgment [23].  For the following

reasons, the former will be denied in all respects and the latter will be granted in part and denied in

part.

## II.    FACTS[1]

On November 22, 1999, Plaintiff SMS Demag, Inc. ("SMS") entered into a contract ("SMS-

NAS contract") with North American Stainless, L.P. ("NAS") to construct a stainless steel melt shop

---

[1]

    The Background section facts are drawn primarily from the admitted facts in the Parties
concise statements of material facts (*See* Docket No. 20, Plaintiff's Statement of Undisputed
Material Facts, and Docket No. 25, Defendant's Concise Statement of Material Facts), unless
otherwise noted.

in Ghent, Kentucky.  (Docket No. 25, at ¶1;  Docket No. 22, Ex. 1, SMS-NAS Contract[2], R-1 - 35).

Under the SMS-NAS contract, SMS was responsible for the overall design, manufacture, and

installation of the equipment required for the melt shop, to include the Electric Arc Furnace

("EAF").  (Docket No. 20, at ¶1; Docket No. 22, Ex. 1, SMS-NAS Contract, R-1 - 35).  The SMS-

NAS contract was valued at more than $100 million.  (Docket No. 20 at ¶1; Docket No. 22, Ex. 1,

at R-9).

In order to fulfill its obligations under the SMS-NAS contract, SMS contracted with

Defendant ABB Transmissone & Distribuzone, S.p.A. ("ABB"), in order to purchase an EAF

Transformer ("transformer").  (Docket No. 25, at ¶2; Docket No. 26, Ex. No. 12, Goetz Deposition[3]

at 9:4-7).  This contract was put into writing by SMS purchase order No. 16265 ("Purchase Order"),

dated April 7, 2000.  (Docket  No. 25, at ¶6; Docket No. 26, Ex. No. 12, at 9:8 - 10).  The purchase

order had terms for the design, manufacture, delivery, and start-up support of the EAF transformer

(Docket No. 20, at ¶6; Docket No. 22, Ex. 2, SMS-ABB Contract, R-36 - 38).  The purchase order

was modified three times and was re-executed by the parties on or about September 21, 2000

("SMS-ABB contract"). (Docket No. 20, at ¶6; Docket No. 22, Ex. 2, SMS-ABB Contract, R-52 -

58).  Lori Goetz was the principal buyer associated with the transformer transaction for SMS and

Tom Slovik was the primary representative for ABB.  (Docket No. 25, at ¶¶ 4-5;  Docket No. 26,

Ex. No. 12, at 9:8 - 10 and 13:17-23).  ABB manufactured the transformer in its facility in Italy and

---

[2]

SMS advised that the contract has been redacted to its "relevant commercial terms only."
The actual contract was actually more than 1200 pages long, including the technical terms.  (Docket
No. 20, at n.1).

[3]

ABB advised that copies of the "relevant" portions of each deposition transcript are included.
(Docket No. 25, at n.1).

delivered it to Kentucky where it was installed by SMS in the NAS melt shop during the summer of 2001, at the expense of SMS, per SMS' contractual obligations. (Docket No. 20, at ¶¶ 15-16).

On February 2, 2002, the NAS melt shop conducted its first production of hot steel using the EAF transformer provided by ABB. *Id.* at ¶17. The transformer remained in operation for approximately two months. *Id.* at ¶18. During this period, SMS began its performance testing of the equipment to ensure compliance with the SMS-NAS contract. *Id.* On April 10, 2002, the transformer "catastrophically failed" causing a complete cessation of performance testing and ancillary steel-making activities at the melt shop. (Docket No. 20, at ¶18; Docket No. 22, Ex. 9, Deposition of Uwe Neubert, R-208). SMS had just begun performance testing when the transformer failed; testing included tests of equipment installed by SMS, to prove the equipment was in compliance with the SMS-NAS contract. (Docket No. 20, at ¶19; Docket No. 22, Ex. 14, at R-1485-1486). As a result of the EAF transformer failure, there was a complete cessation of all performance testing and ancillary steel-making activities at the melt shop. (Docket No. 20, at ¶20; Docket No. 22, Ex. 14, at R-1485-1486).

On April 16, 2002, shortly after the transformer failed, SMS made a warranty claim to ABB under the warranty clause of the SMS-ABB contract. (Docket No. 20, at ¶21; Docket No. 22, SMS Demag Meeting Report, Ex.4, at R-88-90). In response to SMS' warranty claim, ABB facilitated the repair of the transformer. *Id* . As part of this process, the transformer was shipped to an ABB facility in St. Louis, Missouri, the transformer core was re-manufactured, and the transformer was returned to NAS's facility in Ghent, Kentucky. *Id.* As documented in an ABB report dated September 4, 2002, ABB accepted sole responsibility for the failure of the transformer, which was

the result of a manufacturing defect.[4] ABB has never retracted these findings.  *Id.* at ¶23; Docket No. 22, Ex.5, ABB Transformer Failure Report, at R-106-108.  The melt shop was completely out-of-service from April 10, 2002 until approximately May 8, 2002.  (Docket No. 20, at ¶24; Docket No. 22, Ex. A, R-207-211).  Thereafter, SMS and NAS resumed performance testing, on a reduced power basis, following the installation of a temporary, leased EAF transformer.[5]  *Id.*

During the repair process, SMS claims that the SMS and NAS work forces incurred various costs and expenses.  (*See* Docket No. 20, at ¶ 25; Docket No. 22, Ex. 9, Deposition of Miguel Sanchez, R-683-685; Docket No. 22, Ex. 9, Deposition of Alex Gomez, R-697-703; Docket No. 22, Ex. 9, Deposition of Mary Jean Riley, R-943-946).  Specifically, SMS claims that they were forced to do the following: (1) remove the transformer; (2) prepare it for shipment to ABB's St. Louis facilities; (3) obtain a replacement transformer to continue performance testing; (4) design the installation for the replacement; (5) install the replacement transformer, and run necessary tests of said transformer; (6) remove the replacement transformer; (7) install the repaired transformer; and, (8) test and initiate operation of the repaired transformer in order to achieve unrestricted melt shop operation so that performance testing could be completed.  (Docket No. 20 at ¶ 25.)

Turning to the relevant contracts, the Court notes that the instant case essentially concerns two contracts.  First, Plaintiff SMS and NAS entered into the SMS-NAS contract, in which SMS

---

[4]

ABB admitted in their "failure report" that, " [t]his strange deformation [on the transformer] is practically caused by a manufacturing defect."  (Docket No. 20 at ¶23; Docket No. 22, Ex.5, ABB Transformer Failure Report, at R-107).

[5]

SMS has noted that the "replacement transformer" is sometimes referred to as the "Tomini transformer" or the "Tamini transformer," (*See* Docket No. 20, at n.2), however, for simplicity the Court will refer to this transformer as the "replacement transformer."

agreed to design, manufacture, and install the equipment required for a stainless steel meltshop in NAS's facility in Ghent, Kentucky. (Docket No. 25, at ¶1; Docket No. 22, Ex. 1, SMS-NAS Contract, R-1 - 35). In order to fulfill its obligations under the SMS-NAS contract, SMS contracted with Defendant ABB to purchase a transformer, (Docket No. 25, at ¶2; Docket No. 26, Ex. No. 12, Goetz Deposition[6] at 9:4-7), which the parties memorialized in writing in a purchase order, (Docket No. 25, at ¶6; Docket No. 26, Ex. No. 12, at 9:8 - 10). Both the SMS-NAS contract and the SMS-ABB contract contained limitation on liability, warranty and indemnification clauses. (*See* Docket No. 22, Ex. 1, at R-17 - 18, R-24 -25, and R-27; *see also* Docket No. 26-2, Ex. 1, at 9).

1. The SMS-NAS Contract

At Article 16.3, the SMS-NAS contract provides a limitation on consequential damages:

> Neither party shall be in any event responsible to the other party for the following consequential damages: loss of use of the Work, loss of profits, loss of product, or business interruption.

(Docket No. 22, Ex. 1, at R-27).

The SMS-NAS warranty provision specifies, in pertinent part:

> 9.1 Contractor acknowledges that Contractor knows the particular purpose for which the equipment is required and that Purchaser[7] is relying upon Contractor's skill and judgment to furnish suitable Equipment. Contractor warrants the materials and workmanship of the Equipment on a continuous basis for a period of twelve (12) months from the Provisional Acceptance or 37 months after the date of this Agreement, whichever occurs first, if for reasons solely attributable to the purchaser the Provisional Acceptance does not take place on time.

---

[6]
ABB advised that copies of the "relevant" portions of each deposition transcript are included. (Docket No. 25, at n.1).

[7]
"Contractor" under this agreement is SMS. "Purchaser" is NAS.

9.2 Contractor shall promptly correct work or replace the Equipment or any component part found to be defective or Work failing to conform to the Contract Documents, whether observed before or after completion of the Project and whether or not fabricated, installed, or completed. Contractor shall repair or replace all Equipment or any component part and correct all Work at Contractor's expense at no cost to purchaser. Repair or replacement of the equipment or any component part or correction of defective Work shall not impair Purchaser's right to pursue all other remedies allowed purchaser by this agreement. Contractor agrees that the warranty bond referred to in Article 8 above shall have application to Contractor's obligations herein and shall remain in effect in an amount of at least ten (10%) percent of the Contract Sum during the one (1) year following final payment to Contractor as described in Article 4 herein.

9.5 All the Contractor's Work and Scope of Supply is covered by the 12 month Warranty period and the only Warranty of the Work is as described in this Article.

(*See* Docket No. 22, Ex. 1, at R-17 - 18).

The SMS-NAS Contract also contained an indemnification clause at Article 12.1, which reads as follows:

12.1 In addition to the insurance requirements set forth herein (and as described in Addendum 8), and not in lieu thereof, Contractor shall indemnify, hold harmless and defend the Purchaser, its employees, agents, servants, and representatives from and against any and all damages including reasonable attorneys' fees, expenses, claims, suits and demands of whatever nature, resulting from damages to property other than the Work, or injuries, including death, to any person caused by or arising out of any negligent action, omission or operation under this Agreement or in connection with the services attributable to the Contractor or any person or entity providing services as a result of this Agreement. Provided, further, and with the exception to purchaser's gross negligence or willful misconduct, that Contractor shall be required to indemnify the Purchaser, its employees, agents, servants, and representatives hereunder for any claims, damages, or injuries including damages to any property other than the Work, or person. This covenant of indemnity shall expire with the termination of this Agreement, and/or the Final Acceptance of the work which is the completion of the Contractor Work. Contractor shall additionally indemnify and hold harmless the

> purchaser against any assertion of claims by Contractor's
> subcontractors or materials suppliers and against any assertion of
> security interest by suppliers of goods or materials. The
> indemnification obligation set forth herein for any and all claims
> against the Purchaser, including its affiliates, partners, parents and
> subsidiaries, by any employee of Contractor, anyone directly or
> indirectly employed by Contractor or anyone for whose acts the
> Contractor may be liable shall not be limited in any way by way of
> any limitation on the amount or type of damages, compensation or
> benefits payable by or for the Contractor under workers'
> compensation acts, disability benefit acts or other employee benefit
> acts.

(*See* Docket No. 22, Ex. 1, at R-24-25).

### 2. The SMS-ABB Contract

ABB claims that the SMS-ABB contract relieves ABB from liability for consequential damages of any kind. (Docket No. 31, at ¶2). The consequential damages provision in the SMS-ABB contract provides:

> ABB shall not be, in any event, responsible to SMS Demag for
> consequential damages such as loss of use of work, loss of profits,
> loss of product, or business interruption.

(Docket No. 26-2, Ex. 1, at 9). This consequential damages clause in the SMS-ABB contract was the result of extensive pre-contract negotiations between the parties. (Docket No. 20, at ¶11; Docket No. 31, at ¶11).

In addition to the limitation on liability clause, the SMS-ABB contract also contained a warranty clause and an indemnity provision. (See Docket No.20, at ¶¶ 12 and 14; Docket No. 25, at ¶¶ 24 and 36). The warranty clause, contained in Paragraph 10 of the Terms and Conditions section of the contract, states:

> Warranty: The Seller warrants that all articles, equipment, materials,
> labor, or work furnished by the Seller hereunder will conform to the
> specifications and drawings applicable for this purchase order, will

be of good quality and workmanship and will be fit for the purpose intended as well as the purpose for which such articles, equipment, materials, labor or work are generally used, and shall be merchantable, of good materials and workmanship, and free from any fault, imperfection or defect. Seller shall, for a period of one year following the completion, installation and commencement of operation for the ultimate use intended of the work to be performed or the materials or equipment required to be furnished hereunder, at the direction of the Buyer and at the expense of the Seller, replace, repair, and insure any and all faulty or imperfect material or workmanship furnished or performed by the seller hereunder. In the event that seller fails to do so, the Buyer may perform the same and recover the resulting cost and expense from the Seller.

(*See* Docket No. 22, Ex. 2, at R-58). Further, the indemnity clause reads:

Seller hereby agrees to indemnify buyer from any loss, expense, recovery or settlement, including attorneys fees and costs of defense which arise from any demand, claim, or suit which may be asserted or brought against Seller or Buyer as a result of any damage to any person or persons (including death) or property allegedly caused by, resulting from, arising out of, or occurring in connection with the furnishing of any goods or services or the performance or preparation for performance of any of the work or any of the duties of Seller hereunder, or incidental to or appertaining thereto and whether or not such injury is due to or chargeable to any negligence of Buyer, owner, or any contractor under a contract from which the goods or services here ordered are required or the negligence of any employee of Buyer, owner or aforesaid contractor, including but not limited to any claim based on liability without fault for injury caused by defective products supplied by Seller.

(*See* Docket No. 22, Ex. 2, at R-58 and Docket No. 25, Ex. 2).

## III. PROCEDURAL HISTORY

1. <u>Underlying arbitration</u>

The SMS-NAS Contract required that the parties handle any disputes through arbitration, that the arbitration would be in accordance with the American Arbitration Act, that venue would be Cincinnati, Ohio, and that the substantive law of the State of Kentucky would apply. (Docket No.

20, at ¶4; Docket No. 22, Ex. 1, at R-27). On August 2, 2002, NAS brought suit in the United States District Court for the Eastern District of Kentucky against SMS, at civil case number 3:01CV-54, to recover damages related to in the transformer failure. (Docket No. 20, at ¶28; Docket No. 25, at ¶12). NAS's claims against SMS with regard to the EAF transformer failure were asserted in Count III of its fourth amended counterclaim. (Docket No. 25, at ¶13; Ex. 12, at R-1421). In addition to the allegations in Count III, NAS brought additional claims against SMS at Counts II and XIV. (Docket No. 22, Ex. 6, at R-119-120 and R-123-124; Ex. 12, at R-1421 & 1446). Count II stated a claim for damages and costs associated with SMS' alleged failure to achieve provisional acceptance, while Count XIV stated a claim for SMS' alleged failure to acquire and maintain builder's risk insurance coverage for the AEF transformer failure, and other catastrophic failures. (Docket No. 22, Ex. 6, at R-119-120 and R-123-124; Ex. 12, at R-1421 and 1446). Counts II and XIV, which sought more than $4,773,736.50 in damages, were ultimately dismissed by the arbitration panel. (Docket No. 20, at ¶42(a); Docket No. 22, Ex. 12, at R-1421 and R-1446).

On October 1, 2005, the arbitration panel entered a judgment in favor of NAS in the amount of $879,027 at Count III of the counterclaim. (Docket No. 20, at ¶41; Docket No. 22, Ex. 12, at R-1421). This amount was significantly less than the $1,539,340.32 in damages that NAS had alleged at Count III. (Docket No. 22, Ex. 12, at R-1421). The arbitration panel was not clear as to how it arrived at the decision set forth in the award and did not elaborate on its basis for awarding damages. (*See* Docket No. 22, Ex. 12, at R-1421 and R-1446). With respect to the award of damages at Count III of the Fourth Amended Counterclaim, the arbitration panel merely stated that "[t]he evidence of damages is confused. Despite the fact that it changed twice before the briefing, the incorrect figures were used in the brief and at oral argument. After careful consideration of the evidence, the Panel

finds that NAS is entitled to $879,027."  (Docket No. 22, Ex. 12, at R-1421; Docket No. 26, Ex. 4, at 1).

      2.    <u>Current action</u>

On April 8, 2005, SMS commenced the instant action by filing a six-count Complaint, alleging breach of contract, breach of warranty, and indemnification.  (Docket No. 1).  On May 5, 2005, ABB filled its Answer, Affirmative Defenses, and Counterclaim, in which it denied Plaintiff's allegations, set forth fifteen affirmative defenses, and plead a counterclaim for breach of contract.  (Docket No. 3).  On May 17, 2005, SMS filed Plaintiff's Reply and Affirmative Defenses to Counterclaim, in which it asserted eleven affirmative defenses.  (Docket No. 4).

On January 20, 2006, the parties filed the instant pending motions for summary judgment: Plaintiff's Motion for Partial Summary Judgment (Docket Nos. 19-22) and Defendant's Motion for Partial Summary Judgment (Docket No. 23-26).  On February 27, 2006, SMS filed Plaintiff's Response to Defendant's Motion for Partial Summary Judgment (Docket Nos. 27-29) and ABB filed Defendant's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment (Docket Nos. 30-31).  On March 21, 2006, ABB filed Defendant's Reply Brief in Support of its Motion for Partial Summary Judgment (Docket No. 32) and SMS filed Plaintiff's Reply in Support of Motion for Partial Summary Judgment (Docket No. 33).  On May 16, 2006, Judge Thomas M. Hardiman heard oral argument.  (Docket Nos. 36 & 47-2).

Thereafter, on July 6, 2006, the parties proceeded to mediation.  (Docket No. 41).  On September 7, 2006, the parties reported that mediation was unsuccessful.  (Docket No. 42).  On September 27, 2006, Judge Hardiman denied without prejudice the parties' motions for partial summary judgment "pending completion of the parties' mediation efforts."  (Docket No. 43).

Subsequently, during a status conference held on December 28, 2006, the parties informed the Court that their second mediation had been unsuccessful. (Docket No. 45). On January 2, 2007, the parties filed a Joint Motion to Renew Motions for Partial Summary Judgment (Docket No. 46), which the Court granted by text entry on January 5, 2007.

On April 6, 2007, the instant case was reassigned to the undersigned Judge upon Judge Hardiman's ascension to the U.S. Court of Appeals for the Third Circuit. On April 25, 2007, the Court held a status conference with the parties in order to inquire as to the possibility of binding arbitration. (Docket No. 48). Thereafter, while Plaintiff indicated its willingness to submit the instant case to binding arbitration to a single arbitrator governed by the Federal Arbitration Act, (Docket No. 49), Defendant ABB refused to submit the instant matter to binding arbitration, (Docket No. 50).

Currently pending before this court are the parties' motions for partial summary judgment. SMS claims that the arbitration panel awarded compensatory damages to NAS and that the doctrines of issue and claim preclusion place liability for those damages on ABB based on its contractual relationship with SMS. (Docket No. 19). ABB counters that the damages SMS seeks to recover are barred by the limitation on consequential damages clause present in the SMS-ABB contract and that ABB is entitled to summary judgment as a matter of law. (Docket No. 23).

SMS claims by way of its motion for partial summary judgment, that it is due reimbursement of the $879,027 it paid NAS as was awarded by the arbitration panel as damages less the amount of $228,037.50, which SMS withheld on the balance of the contract sum given what it perceived as the overall failure of ABB to comply with the contract, leaving a net amount of $650,989.50 due and owing. (Docket No. 20, at ¶¶42 and 45 a. - c.; Docket No. 22, Ex. 12, at R-1442; Docket No. 22,

Ex. 17, at R-1551-1552). SMS further claims that it is due 8% interest on the net amount of $650,989.50, starting from the date of February 26, 2003 and accruing for a period of three years, through February 26, 2006. (Docket No. 20, at ¶45 c; Docket No. 22, Ex. 12, at R-1442; Docket No. 22, Ex. 17, at R-1551-1552). ABB denies that SMS is entitled to recover anything from ABB. It also asserts that it is entitled to partial summary judgment as to Plaintiff's breach of warranty and indemnification claims for the following reasons: (1) it has fully complied with the warranty clause; and (2) it owed no duty to indemnify because the claims made by Plaintiff fall outside the scope of the indemnification provisions. (Docket No. 31, at ¶45).

## IV.  STANDARD OF REVIEW

Summary judgment may only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Pursuant to Rule 56, the Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' – that is, pointing out to the District Court – that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325.

In evaluating the evidence, the Court must interpret facts in the light most favorable to the non-moving party, and draw all reasonable inferences in his favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007); *see also Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974

F.2d 1358, 1363 (3d Cir. 1992) (providing that "inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true").  Initially, the burden is on the moving party to demonstrate that the evidence in the record creates no genuine issue of material fact. *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004).  The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005).  While the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the admissible evidence in the record would be insufficient to carry the nonmovant's burden of proof at trial.  *Celotex*, 477 U.S. at 322-323.  Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial.  *Id.* at 324.  The nonmoving party "cannot simply reassert factually unsupported allegations contained in its pleadings." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## V.    DISCUSSION

### 1.    Plaintiff's partial motion for summary judgment

In Plaintiff's motion for partial summary judgment, SMS requests a determination of the liability of Defendant ABB for a warranty claim for which Plaintiff was held responsible in the underlying arbitration between SMS and NAS.  (Docket No. 19, at 1).  SMS argues that the doctrines of *res judicata* and collateral estoppel are applicable here to pass through damages to ABB that SMS was found liable for in the arbitration with NAS. (Docket No. 21, at 4-14).

At the outset, the Court notes that the essence of Plaintiff's argument is unclear, i.e., of what claim or issue does it seek preclusion? While Plaintiff refers to a "warranty claim" in its motion and brief, which reference would seemingly apply to its claim preclusion argument, it never specifically states the subject of its issue preclusion argument. To the extent that Plaintiff seeks issue preclusion as to liability for the "warranty claim" litigated between SMS and NAS and arising out the SMS-NAS contract, the Court finds that this argument, on its face, is without merit.

Before addressing the merits of the Plaintiff's motion for summary judgment, the Court must first engage in a choice of law analysis. Under Pennsylvania choice of law rules, which a district court sitting in diversity must apply,[8] *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941), the Court is to apply the preclusion law of the state that entered the prior judgment. *Wilkes v. Phoenix Home Life Ins. Co.*, 902 A.2d 366, 377 (Pa. 2006) (noting "ample authority weighing in favor of the proposition that the court should apply the res judicata law of the state that rendered the prior judgment");[9] *see also Gregory v. Chehi*, 843 F.2d 111 (3d Cir. 1988) (determining that where there are issues of claim and issue preclusion, the Court must look to the preclusion laws of the state rendering the judgment) (citations omitted). Here, the judgment at issue for purposes of claim and issue preclusion was rendered by a federal court applying the substantive law of Kentucky by way of an arbitration panel award.[10] Therefore, Kentucky law applies as to Plaintiff's argument that the

---

[8]

*See* Plaintiff's Complaint, at ¶1.

[9]

While noting the unclear nature of this analysis, in support of its decision to apply the law from the state that rendered the judgment, the Pennsylvania Supreme Court cited the Restatement Second of Conflicts and numerous cases. *See id.*

[10]

The Court notes that the NAS-SMS contract contained a choice of law provision which stated at Article 16.1 that "[t]he substantive law of the State of Kentucky shall apply." (Docket No.

arbitration panel's award binds ABB in the present matter.[11]  The Court will address *res judicata* and collateral estoppel in turn.

### A.    *Res judicata or claim preclusion*

"The rule of res judicata operates to preclude repetitious claims."  *Owens v. Baker*, No. 2005-CA-002290-MR, 2006 WL 3751362, at *2 (Ky.App. Dec. 22, 2006).  The Sixth Circuit requires four elements to successfully assert *res judicata* as a bar to a subsequent claim: (1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their privies; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action.  *Ventas, Inc. v. Health Care Property Investors, Inc.*, Civil Action No. 3:07-CV-00238-H, 2007 WL 4547389, at *2 (W.D. Ky.

_____

22-2 at R-27.)  The Court further notes that the parties' briefs in the arbitration appear to rely on Kentucky and Sixth Circuit law.  (*See* Docket No. 22-27, R-1288-R-1300; Docket No. 22-28, R-1301-R-1316).

[11]    Nevertheless, to the extent that the parties agree (or believe) that federal law applies, the Court notes that federal law as to *res judicata* and collateral estoppel appears substantially similar to that of Kentucky law.  *See Banks v. Hayward*, No. Civ. A. 06-1572, 2007 WL 120045, at *3 (W.D. Pa. Jan. 10, 2007) (quoting *Lubrizol Corp. v. Exxon Corp.*, 929 F.2d 960, 963 (3d Cir. 1991)) ("The federal law of res judicata or claim preclusion bars a cause of action where there "has been (1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same cause of action"); *In re Cowden*, 337 B.R. 512, 530 (Bkrtcy. W.D. Pa. 2006) ("As for federal principles of collateral estoppel, the Third Circuit, as set forth in its decisions over the years, has required varying combinations of the following elements to be present in order for collateral estoppel to apply:  (1) The issue sought to be precluded is the same as that decided in the prior action; (2) That issue was actually litigated in the prior action; (3) The resolution of that issue was determined by a valid and final judgment on the merits; (4) The resolution of such issue must have been essential to the prior judgment; (5) The party against whom the bar of collateral estoppel is asserted was a party or in privity with a party to the prior adjudication; and (6) The party against whom such bar is asserted had a full and fair opportunity to litigate the issue in question in the prior action").

In particular, the elements of collateral estoppel that the Court relies on below are common to both federal law and Kentucky law.

Dec. 19, 2007) (citing *Kane v. Magna Mixer Co.*, 71 F.3d 555, 560 (6th Cir. 1995)).

SMS argues that the instant suit involves the same cause of action as the SMS-NAS arbitration. (Docket No. 33, at 3). Relying on Third Circuit case law, specifically *United States v. Athlone Indus., Inc.*, 746 F.2dd 977, 983 (3d. Cir. 1984), Plaintiff argues that there is no exactness requirement for the "same cause of action" element of claim preclusion but that a court should "look toward the 'essential similarity of the underlying events giving rise to the various legal claims' " in determining whether the two cases involve the same cause of action. (Docket No. 33, at 3) (quoting *Athlone*, 746 F.2d at 983). SMS concludes that because the underlying events, facts, and acts are the same in the instant action and the arbitration, the Court must apply claim preclusion, regardless of whether the two cases are based on the interpretation of different contracts. (Docket No. 33, at 4).

As an initial point, as demonstrated above, Plaintiff's reliance on *Athlone* is misplaced insofar as the question of the preclusive effect of the arbitration is governed by Kentucky law, not Pennsylvania law. To that end, under Kentucky law, one of the requirements for res judicata is the identity of the issues in both actions. The key inquiry in deciding whether the lawsuits concern the same controversy is whether they both arise from the same transactional nucleus of facts. In other words, identity of the causes of action requires "an identity of the facts creating the right of action and of the evidence necessary to sustain each action." *Westwood Chemical Co., Inc. v. Kulick*, 656 F.2d 1224, 1227 (6th Cir. 1981) (citations omitted). If the two suits concern the same controversy, then the previous lawsuit is deemed to have adjudicated every matter which was or could have been brought in support of the cause of action. *Yeoman v. Commonwealth*, 983 S.W.2d 459, 465 (Ky. 1998).

Here, the Court finds that the there is no identity of the issues between the arbitration and the instant lawsuit. While the underlying facts are common to the extent that both actions arose out of the failure of the transformer, in the Court's view, the common facts do not determine the outcome here because the failure of the transformer is not in dispute and the similarities between the two actions end there. On the contrary, the arbitration action and the instant lawsuit concern different theories of recovery based on different contracts negotiated at different times between different parties. *See Kulick*, 656 F.2d 1227 (applying *res judicata* based on the fact that the two actions concerned the same "General Release"). Furthermore, the "evidence necessary to sustain each action" is different from the arbitration to the instant action in that the latter requires the interpretation of a separate and distinct contract (the SMS-ABB Contract as opposed to the SMS-NAS Contract) and the testimony of different witnesses and the introduction of different evidence, i.e, the contracts. While some facts and evidence may carry over from the hearing before the arbitration panel to the instant case, the instant action involves additional evidence and witnesses required to prove liability. Specifically, the facts surrounding the formation and negotiation of the SMS-ABB contract, which were not material in the arbitration in order to show that SMS breached its contract with NAS must be developed here.

As such, the Court finds that Plaintiff SMS has failed to shoulder its burden to establish *res judicata*. The cause of action in the instant case is not the same cause of action decided by the arbitration panel. Because the two cases do not involve the same cause of action, SMS cannot rely on the doctrine of claim preclusion to hold ABB liable.[12]

---

[12]

At the end of its *res judicata* argument, SMS asserts (in a footnote) the following: "The Court notes that ABB could not have joined or been joined in the Arbitration because of the compulsory arbitration clause in the SMS-NAS contract and the absence of such a provision in the

17

B.     *Collateral estoppel or issue preclusion*

Under the well-settled doctrine of collateral estoppel or issue preclusion, a party is bound by a prior adjudication against it on an issue if the prior issue was an essential component of that action, even though the parties were not completely identical in each action. *Weddington v. Travelers Property & Cas. Ins. Co.*, No. 2007-CA-000169-MR, 2007 WL 4214437, at *1(Ky.App. Nov. 30, 2007) (citing *Jellenik v. Capitol Indem. Corp.*, 210 S.W.3d 168, 171 (Ky.App. 2006)).  In the Sixth Circuit, the doctrine of collateral estoppel requires proof of the following five elements: (1) the issue in the subsequent litigation is identical to that resolved in the earlier litigation; (2) the issue was actually litigated and decided in the prior action; (3) the resolution of the issue was necessary and essential to a judgment on the merits in the prior litigation; (4) the party to be estopped was a party to the prior litigation (or in privity with such a party); and (5) the party to be estopped had a full and fair opportunity to litigate the issue.  *Hammer v. I.N.S.*, 195 F.3d 836, 840 (6th Cir. 1999).  *See also Eckstein v. Cincinnati Ins. Co.*, 469 F.Supp.2d 444, 452 (W.D.Ky. 2007) ("The Kentucky Supreme Court in *Moore v. Commonwealth, Cabinet for Human Res.*, 954 S.W.2d 317, 319 (Ky. 1997) listed the essential elements of collateral estoppel as follows: (1) identity of issues; (2) a final decision or judgment on the merits; (3) a necessary issue with the estopped party given a full and fair opportunity to litigate; (4) a prior losing litigant").  The party asserting collateral

---

SMS-ABB contract."  (Docket No. 21, at 9 n.4) (emphasis in original).  First, SMS fails to specify where or when the Court noted the above.  Second, SMS fails to point to the relevant portions of the contracts.  Third, Plaintiff's implication that it is somehow inequitable as to their inability to join ABB in the arbitration falls on deaf ears because SMS was a party to each contract and negotiated the terms of each contract.  Fourth and finally, to the extent that ABB could not have been joined per one or both of the contracts, the same only supports the Court's decision not to apply *res judicata* here in that not only was ABB not a party to the arbitration, but it could not have been a party to the arbitration.

estoppel bears the burden of establishing each of these elements. *Spilman v. Harley*, 656 F.2d 224, 229 (6th Cir. 1981).

As to the "full and fair opportunity to litigate" element, the Court must inquire whether the judgment was rendered under such conditions that the party against whom collateral estoppel is pleaded had a realistically full and fair opportunity to present his case. *Sedley v. City of West Buechel*, 461 S.W.2d 556, 559(Ky. 1970). SMS asserts that ABB had a full and fair opportunity to litigate because (1) "ABB participated in the defense of the NAS claims by providing examples of spare-transformer-equipped plants and testifying as to the standard of care of any owner of a steel plant in this regard, including furnishing testimony in support of SMS" and (2) ABB should bear the burden because it did not assist SMS in the arbitration proceeding but now "asserts technical defenses to this case which it did not assist SMS in providing during the Arbitration." (Docket No. 21, at 13) (emphasis in original). The Court finds that this argument is insufficient for purposes of the "full and fair opportunity to litigate" element of collateral estoppel.

As to the former, SMS fails to cite to any specific portion of the record of the arbitration proceeding and the Court declines to scroll through hundreds of pages of transcript proceedings in order to find the pertinent passage (or passages) referenced by SMS.[13] In the same manner, SMS directs the Court to no case law from any court in support of its position that participation in a prior proceeding constitutes "full and fair opportunity to litigate" for purposes of collateral estoppel. As

---

[13]

Local Rule 56.1(A)(1) requires a party in its concise statement of material facts to "cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record supporting the party's statement, acceptance, or denial of the material fact."

The Court notes that here Plaintiff attached excerpts from the arbitration proceedings to its motion, and relies on those excepts without offering specific citations to the record in its concise statement, including the deposition testimony of Thomas Slovik from ABB.

to the substance of its argument, Plaintiff's unsupported statement reveals nothing more than ABB's limited participation in the arbitration proceedings as to a discrete issue, which nevertheless, does not relate to the merits of the instant matter. Based on the argument presented by Plaintiff, the Court finds that ABB's participation by way of or through witness testimony from Mr. Slovik in the arbitration falls far short of a "full and fair opportunity to litigate."

As to the latter, Plaintiff's argument may sound in equity, but the Court finds that, as the party who filed the instant lawsuit, Plaintiff caused any "duplicity" between the arbitration proceeding and the instant cause of action (to the extent that the same is even duplicitous, which the Court does not concede). Moreover, Plaintiff's second argument directly contradicts its first argument in that while SMS initially asserts that ABB "participated in the defense of the NAS claims" at the arbitration proceeding, (Docket No. 21, at 13), SMS later complains of the inequity "if ABB asserts technical defenses to <u>this case</u> *which it did not assist SMS in providing during the Arbitration*," (Docket No. 21, at 13) (first emphasis in original; second emphasis added). Hence, by Plaintiff's own admission, it appears that ABB did not assist SMS to any meaningful degree during the arbitration. Further, SMS again fails to cite to any case law or other authority in support of its position.

Accordingly, the Court concludes that SMS has failed to meet its burden to establish that ABB had a full and fair opportunity to litigate in the arbitration proceeding and thus, the application of collateral estoppel to this case is not appropriate. Having found Plaintiff's argument to be deficient as to one element of the collateral estoppel analysis, the Court sees no need to consider the same in any greater length.

C.      *Conclusion*

Based on the foregoing, the Court denies Plaintiff's Motion for Partial Summary Judgment [19] in all respects.[14]

## 2.    Defendant's motion for partial summary judgment

In the instant case, SMS has brought suit against ABB claiming breach of contract, warranty and indemnification under both the Pennsylvania Uniform Commercial Code ("Pa. U.C.C.") and the common law of Pennsylvania.  (Docket No. 1.)  ABB has moved for summary judgment on the breach of warranty and indemnification provisions claims without distinguishing between the common law and Pa. U.C.C. counts.  (Docket No. 23.)  As the claims are all plead as a breach of the express terms in different provisions of the contract, the Court will analyze the Defendant's motion for summary judgment under prevailing contract law principles.

At the outset, the parties agree that the contract consists of a Purchase Order and the SMS Demag Terms and Conditions (hereinafter collectively "contract") (See Docket Nos. 22-2 at 36-50, and Docket Nos. 22-3 at 1-8).  Further, the Court agrees with the parties that the contract is between two sophisticated parties and was negotiated at arms length. (*See* Docket No. 20, at ¶11; Docket No. 31, at ¶11).

In section 23 of the Terms and Conditions, the parties have agreed that Pennsylvania law will be applied to interpret the contract.  (Docket No. 22-3, R-58).  Neither party has contested such application of Pennsylvania law, and "Pennsylvania courts generally honor the intent of the

---

[14]    The Court notes that in light of the holding denying Plaintiff's assertion of *res judicata* and collateral estoppel, Plaintiff's further arguments, that the full faith and credit clause of the U.S. Constitution requires the Court to give full faith and credit to the arbitration award, and that the arbitration panel awarded compensatory and not consequential damages to NAS, also fail.  (Docket No. 21 at 4-14).

contracting parties and enforce choice of law provisions in contracts executed by them." *Kruzits v. Okuma Mach. Tool, Inc*., 40 F.3d 52, 55 (3d Cir. 1994) (citing *Smith v. Commonwealth Nat. Bank*, 384 Pa.Super. 65, 557 A.2d 775, 777 (1989), appeal denied, 524 Pa. 610, 569 A.2d 1369 (1990)). As such, the Court will apply Pennsylvania law to interpret the contract.

Pennsylvania rules of contract interpretation require the court to "ascertain and give effect to the intent of the contracting parties." *Murphy v. Duquesne University Of The Holy Ghost*, 565 Pa. 571, 590-591 (Pa. 2001). Such intent is to be determined from reading the entire agreement as a whole and "when a writing is clear and unequivocal, its meaning must be determined by its contents alone." *Murphy*, 565 Pa. at 591 (citations omitted). If the terms of a contract are unambiguous, the plain meaning of the terms of the agreement will be enforced. *Id.* If, however, the terms of a contract are ambiguous, extrinsic and parol evidence is admissible to interpret the contract. *Id.* "A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This question, however, is not resolved in a vacuum. Instead, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Id.*

With these principles in mind, the Court now turns to the terms of the warranty and indemnification provisions of the contract. Each provision is discussed below, in turn.

A.      *Breach of warranty claims*

In its motion, Defendant argues that the warranty clause is unambiguous and that it has fully complied with the warranty clause in the contract. (Docket No. 24.) Defendant interprets the warranty clause as to require it to repair and replace the damaged transformer, and asserts that the undisputed facts show that it did repair the transformer, at its own cost and also paid for

transportation to and from the NAS facility in Kentucky to the repair facility in St. Louis. (Docket No. 24). Plaintiff also asserts that the warranty clause is unambiguous but counters that the repair and replace language should be interpreted more broadly to include certain additional costs and expenses incurred by NAS/SMS in the transition between the removal of the damaged transformer and the installation/removal of a replacement transformer, and for the lease of such replacement. (Docket No. 28). While both parties assert that the clause is unambiguous, each arrives at a different interpretation of the clause. For the Court to find that such differing interpretations create ambiguity, and hence, the existence of genuine issues of material fact sufficient to defeat Defendant's motion for summary judgment, both interpretations must be reasonable.

The warranty clause contained in Paragraph 10 of the Terms and Conditions section of the contract, provides as follows:

> Warranty: The Seller warrants that all articles, equipment, materials, labor, or work furnished by the Seller hereunder will conform to the specifications and drawings applicable for this purchase order, will be of good quality and workmanship and will be fit for the purpose intended as well as the purpose for which such articles, equipment, materials, labor or work are generally used, and shall be merchantable, of good materials and workmanship, and free from any fault, imperfection or defect. Seller shall, for a period of one year following the completion, installation and commencement of operation for the ultimate use intended of the work to be performed or the materials or equipment required to be furnished hereunder, **at the direction of the Buyer and at the expense of the Seller, replace, repair, and insure any and all faulty or imperfect material or workmanship furnished or performed by the seller hereunder. In the event that seller fails to do so, the Buyer may perform the same and recover the resulting cost and expense from the Seller.**

(Docket No. 22, Ex. 2, at R-58) (emphasis added). The parties do not dispute that the warranty is applicable or contest that a claim was not made within one year of the "operation for the ultimate

23

use intended" of the transformer, the only dispute is the scope of the warranty clause, including the definition of "replace, repair and insure any and all faulty or imperfect material or workmanship furnished or performed hereunder." (*See* Docket No. 24 at 5-7; Docket No. 28 at 5-6.) To determine the scope of the warranty clause, the Court must ascertain the intent of the parties from the contract as a whole, and the warranty provision requires the Court to look to the Purchase Order to define the terms "articles, equipment, materials, labor, or work." (*See* Docket No. 22, Ex. 2, at R-58.)

The relevant portions of the Purchase Order provide that ABB was to furnish SMS with the following materials or services, including a "FURNACE TRANSFORMER PER SPECIFICATION" and with "FIELD SERVICE FOR FURNACE TRANSFORMER." (Docket No. 22-2 at R-37 (emphasis in original)). To determine the exact specifications of the Furnace Transformer, one must go outside the Purchase Order and presumably to another ABB document to find "6200-01 REVISION O, DATED 4-3-00 AND ABB TECHNICAL DATA AND MATERIAL SPECIFICATIONS, REFERENCE NO. L00100, DATED 3-6-00 WITH HAND WRITTEN CHANGES." *Id.* While most of the engineering specifications of the transformer would not be relevant here, the size, weight and maneuverability of the transformer are all very relevant to ascertain the intent of the parties at the time of contracting as to what would be required of ABB to "repair, replace and insure" and hence comply with the Warranty provision.

The term "FIELD SERVICE FOR FURNACE TRANSFORMER" is also left undefined in both the Purchase Order and the Terms and Conditions. In this Court's estimation, this term implies that some work by ABB was required to be done on site at NAS or services to be provided in the "Field." To further ascertain the type of services required to be performed by SMS at the site the Court will again look to other provisions in the contract. Relevant here is the shipping term which

required certain services to be provided by SMS. It was ABB's duty under the contract to ship the transformer to NAS in Ghent, Kentucky under the following shipping terms "DDP - Ghent, Kentucky - SMS Demag to unload at job site." "DDP [ ] is an INCOTERM for 'Delivered Duty Paid,' and means that title to the [transformer] and risk for its loss or damage transferred when the [transformer is] put at the disposal of the buyer at the named place (seller bears all risks of the goods during the whole transport)." *Skandia Ins. Co. v. Star Shipping AS*, 173 F. Supp. 2d 1228, 1234 (S.D. Ala. 2001). The parties therefore contemplated that ABB would be responsible for shipping the transformer and to bear the risk of loss while the transformer was in transit, but that SMS Demag would unload the transformer at its site. The field services to be provided by ABB therefore must have required substantive work on the transformer at the site not related to unloading the transformer. The Court finds that the contract does not specifically define the materials and services to be provided by ABB in conjunction with the sale of the transformer and that as a result, an ambiguity exists as to the definition of "articles, equipment, materials, labor, or work."

The Court finds further ambiguity in that both parties' interpretation of "repair, replace and insure" in the contract applied to the facts of this case is reasonable. Based on the nature of the transformer such that it could not be easily removed for service to be provided under the warranty provision, it is a reasonable to conclude that to fully comply with the warranty, ABB would be required to cover the replacement costs and expenses sought in this action by Plaintiff. Likewise, it is a reasonable reading of the clause to conclude that the repair and replace language required ABB to repair the damaged transformer and replace any faulty parts, as it did here.

As such, the Court further finds that ambiguity exists as to the terms of the contract, requiring the admission of extrinsic or parol evidence to ascertain the intent of the parties at the time

that the contract was formed. *See Murphy*, 565 Pa. at 591 ("[o]nly where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties."). While both parties have proffered some evidence to determine the parties' intent, the Court finds that issues of fact remain as to the interpretation of the language in the warranty clause. Further, genuine issues of material fact also exist as to the "direction of the Buyer" required under the warranty provision that was made by Plaintiff to Defendant in a letter from Achim Juergens dated April 16, 2002,[15] and as to whether Defendant's conduct in paying transit costs and absorbing the costs of materials and labor to fix the transformer ultimately complied with the warranty provision.

Defendant also claims that it is entitled to summary judgment by virtue of the Limitation of Liability Provision contained in the Purchase Order. The provision states that "ABB shall not be, in any event, responsible to SMS Demag for consequential damages such as loss of use of the work, loss of profits, loss of product, or business interruption." By definition, consequential damages are damages resulting from a breach that were reasonably contemplated by the parties at the time of contracting. *See* 13 Pa.C.S. § 2715(b).[16] While a limitation of liability clause for consequential

---

[15]

    *See* Docket No. 26-6. In a letter to Mr. Tom Slovik of ABB, Mr. Juergens wrote, in pertinent part, that "Pursuant to Item 10 Warranty of our standard terms and conditions (copy enclosed), SMS Demag, Inc. hereby notifies ABB regarding its responsibility to repair, replace, and insure any and all faulty or imperfect material or workmanship furnished or performed by ABB against our Purchase Order 16265 (EAF Transformer)."

[16]

    The Court notes that the contract does not contain a limitation on liability for incidental damages, and that any award of damages in this case will turn on the classification of Plaintiff's *proved damages* as either incidental or consequential. "While the distinction between [incidental and consequential damages] is not an obvious one, the Code makes plain that incidental damages are normally incurred when a buyer (or seller) repudiates the contract or wrongly rejects the goods, causing the other to incur such expenses as transporting, storing, or reselling the goods. On the other hand, consequential damages do not arise within the scope of the buyer-seller transaction, but rather stem from losses incurred by the non-breaching party in its dealings, often with third parties, which

damages will generally be upheld between two sophisticated parties involved in an arms length transaction, as the case certainly is here, because the scope of the warranty provision remains in dispute, the Court cannot classify all of the damages claimed by the Plaintiff to be consequential, at this time.   Therefore, the Court denies Defendant's motion for partial summary judgment on grounds that the Limitation of Liability provision bars all of Plaintiff's claims.

    B.    *Breach of indemnity claims*

    In its motion for partial summary judgment, Defendant argues that the indemnification clause is unambiguous and that no duty to indemnify is owed by Defendant in this matter because the

---

were a proximate result of the breach, and which were reasonably foreseeable by the breaching party at the time of contracting." *Atlantic Paper Box Co. v. Whitman's Chocolates*, 844 F.Supp. 1038, 1046 (E.D.Pa.,1994) (citing *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng.Rep. 145 (1854)).

    The Supreme Court of Pennsylvania has defined incidental damages as damages "aimed at reimbursing the buyer for expenses incurred in rightfully rejecting goods, or in connection with effecting cover." *AM/PM Franchise Ass'n v. Atlantic Richfield Co.,* 584 A.2d 915, 919 n.3 (Pa.,1990).  Pennsylvania courts have most often awarded incidental damages that are incurred while the buyer is attempting to repair the damaged goods or effectuate cover.  *See Willred Co. v. Westmoreland Metal Mfg. Co.*, 200 F.Supp. 59 (E.D. Pa. 1961) (applying Pennsylvania law) (awarding employee's travel costs to repair furniture); *Traynor v. Walters,* 342 F Supp 455 (M.D. Pa., 1972) (applying Pennsylvania law) (held that the buyer was entitled to recover as incidental damages under § 2-715 the additional expenses that he was forced to incur to sell the rejected trees).

    Moreover, the award of consequential damages is factually intensive under Pennsylvania law and Courts in the Commonwealth have awarded consequential damages based on a variety of factual situations, including loan interest, equipment and property rental, and lost profits.  *See Carl Beasley Ford, Inc. v Burroughs Corp.*, 361 F Supp 325 (E.D. Pa 1973) (applying Pennsylvania law) (awarding the plaintiff the interest on a loan used to buy a defective computer); *Puritan Mfg., Inc. v. I. Klayman & Co.*, 379 F.Supp. 1306 (E.D. Pa. 1974) (applying Pennsylvania law) (awarded purchase of additional equipment because livers had to be double handled due to breach); *English Whipple Sailyard, Ltd. v. Yawl Ardent*, 459 F.Supp. 866 (W.D.Pa., 1978) (awarding the rent of a dock that was not used because the boat sank); *Traynor v. Walters*, 342 F.Supp. 455 (M.D.Pa., 1972) (applying Pennsylvania law) (awarded lost profits).

claims made by Plaintiff "do not fall within the scope of the indemnity provisions of the contract." (Docket No. 23 at 1.) Defendant contends that under the indemnity clause, Defendant is required only to indemnify Plaintiff for losses suffered by third parties resulting in property damage or personal injury, and that no such claims were made by Plaintiff. (Docket No. 24 at 7-9.) In response, Plaintiff also asserts that the Purchase Order is unambiguous, and does not counter the Defendant's assertion that the indemnification clause is restricted to personal injuries and property damage to third parties. (See Docket No. 28.) Plaintiff instead relies on arguments set forth in its own motion for partial summary judgment, that either claim or issue preclusion apply to pass through damages awarded against SMS from the arbitration to ABB. (Docket No. 28.)

Under Pennsylvania law, with the contract interpretation principles discussed above, the Court must also apply additional principles to properly interpret indemnity provisions. Pennsylvania law requires that "[i]ndemnity agreements [ ] be narrowly interpreted in light of the parties' intentions as evidenced by the entire contract." *Consolidated Rail Corp. v. Delaware River Port Authority,* 880 A.2d 628, 632 (Pa.Super.2005) (citing *Fox Park Corp. v. James Leasing Corp.*, 433 Pa.Super. 505, 641 A.2d 315 (1994)). Further, any ambiguity in the contract will be construed against the party seeking indemnification. *Valhal Corp. v. Sullivan Assoc., Inc.*, 44 F.3d 195, 202 (3d Cir.1995). Here, Plaintiff is the party seeking indemnification and as such, the Court will construe any ambiguity in the indemnification clause against it.

The Court now turns to the terms of the Indemnity Provision in the Purchase Order. Both parties agree that the indemnity clause contained in the contract provides as follows:

> [s]eller hereby agrees to indemnify buyer from any loss, expense, recovery or settlement, including attorneys fees and costs of defense which arise from any demand, claim, or suit which may be asserted or brought against Seller or Buyer **as a result of any damage to any**

> **person or persons (including death) or property allegedly caused by, resulting from, arising out of, or occurring in connection with the furnishing of any goods or services or the performance or preparation for performance of any of the work or any of the duties of Seller hereunder**, or incidental to or appertaining thereto and whether or not such injury is due to or chargeable to any negligence of Buyer, owner, or any contractor under a contract from which the goods or services here ordered are required or the negligence of any employee of Buyer, owner or aforesaid contractor, including but not limited to any claim based on liability without fault for injury caused by defective products supplied by Seller.

*See* Docket No. 22, Ex. 2, at R-58 and Docket No. 25, Ex. 2 (emphasis added).  Both parties argue that the indemnity provision is unambiguous.  (*See* Docket No. 24 at 7-9; Docket No. 28 at 4-5.)

The Court agrees with the parties that the indemnity clause is unambiguous and as such, will apply the plain meaning of the terms to the provision.  The Court further finds that ABB's interpretation of the indemnification clause, that indemnification is restricted to third party claims against SMS for personal injury or property damage, to be a reasonable interpretation of the clause. Under the clause, Seller (ABB) agrees to indemnify Buyer (SMS) from any loss, etc., as a result of certain types of damage, i.e., "any damage to any person or persons (including death) or property." The Court finds that the quoted language connotes either personal injury or property damage compensable under a tort theory, and that such interpretation is further supported by additional language in the clause that "whether or not such injury is due to or chargeable to any ***negligence*** of Buyer ..."  (Docket No. 25, Ex. 2.)  While SMS has only asserted here that ABB is liable to SMS by virtue of a breach of contract claim brought against it by NAS, the Court looks to the claims set forth by SMS to ascertain the type of damage sought in the present action.

In its Complaint, Plaintiff has asserted claims for the following damages allegedly caused by ABB in that:

(a) the melt shop was not producing stainless steel, a product which would have been sold by NAS, at a profit;

(b) NAS and SMS expended manpower and materials to remove the damaged EAF transformer;

(c) NAS and SMS expended manpower and materials to install the temporary transformer;

(d) NAS and SMS expended manpower and materials to remove the temporary transformer and install the re-manufactured transformer;

(e) performance testing of the melt shop was impeded;

(f) provisional acceptance of the melt shop was delayed; and,

(g) SMS suffered other damages which will be shown at trial on this matter.[17]

(Docket No. 1 at ¶ 24.)  In sum, the instant complaint sets forth claims against ABB for lost profits due to the lack of production at the facility while the transformer was disabled; money damages for services performed by SMS/NAS for which ABB is allegedly liable; and, other damages to be proven at trial.  There are no allegations of any third parties suffering damage due to personal injury and there are no allegations of any property damage to a third party, including NAS, other than the damage to the transformer itself.  These claims are beyond the agreed upon indemnity language. Defendant also argues that it is entitled to summary judgment on Plaintiff's claims of attorneys' fees. (Docket No. 24 at 13-14.)  Defendant's motion is granted as Plaintiff's request for attorneys' fees under the indemnification provision fails because there are no allegations of property damage or personal injury to a third party and any request for attorneys' fees for the prosecution of this action

---

[17]

To the extent that Plaintiff seeks "other damages" within the scope of the damages in the arbitration action as set forth in Plaintiff's concise statement of material facts, *see* Docket No. 20 at ¶¶ 29-31, this Court does not find them to be within the contemplation of the indemnity provision which clearly pertains only to personal injury, death and property damage.

are banned under the American Rule.[18]

Further, Plaintiff's burden on summary judgment, after Defendant has shown that there is an absence of evidence to support Plaintiff's case, as Defendant has done here, requires Plaintiff to go beyond the pleadings and present the Court with specific facts to show that there is a genuine issue entitling it to a trial on the merits. *See* F.R.C.P. 56(e)(2). Plaintiff has made no such showing and therefore, Defendant's Motion on Plaintiff's Indemnity claims is granted.

C.     *Conclusion*

Based on the foregoing, the Court grants in part and denies in part Defendant's motion for partial summary judgment. The motion is granted to the extent that the Court finds that Plaintiff has failed to adduced sufficient evidence to show that it has stated a viable claim for indemnity under the contract or that a genuine issue of fact exists as to such breach. The motion, however, is denied to the extent that Defendant is not entitled to summary judgment on the breach of warranty clause as the Court finds that the clause is ambiguous and that genuine issues of material fact exist as to its interpretation and the application of the provision to ABB.

VI.     **CONCLUSION**

Accordingly, for the reasons stated above, it is hereby ordered that Plaintiff's Partial Motion for Summary Judgment [19] is denied and Defendant's Motion for Partial Summary Judgment [23]

---

[18] The Court notes that "under the 'American Rule,' parties to litigation are to pay their own attorneys' fees, absent statutory authority and a court order providing otherwise." *People Against Police Violence v. City of Pittsburgh*, --- F.3d ----, 2008 WL 696894, *3 (3d Cir. 2008) (citing *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dep't. of Health and Human Resources*, 532 U.S. 598, 602 (2001)). Therefore, any claim for attorneys' fees in this breach of contract action must rely on the express provisions of the contract.

is granted in part and denied in part.  An appropriate Order follows.


*/s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge


Dated: March 31, 2008

cc:      All counsel of record.